# 26-2516-cv

IN THE

## United States Court of Appeals for the Second Circuit

THE NIELSEN COMPANY (US) LLC,

*Defendant-Appellant*,

v.

CUMULUS MEDIA NEW HOLDINGS INC.,

*Plaintiff-Appellee*.

Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR PLAINTIFF-APPELLEE**
**[Redacted Version]**


CHARLES LOUGHLIN
JENNIFER FLEURY
MICHAEL J. WEST
HOGAN LOVELLS
CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

KATHERINE B. WELLINGTON
*Counsel of Record*
HOGAN LOVELLS
CADWALADER US LLP
125 High St., Suite 2010
Boston, MA 02110
(617) 371-1037
katherine.wellington@hlc.com

*Counsel for Plaintiff-Appellee Cumulus Media New Holdings Inc.*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff Cumulus Media New Holdings Inc. ("Cumulus") is a wholly owned subsidiary of Cumulus Media Intermediate Inc. Cumulus Media Intermediate Inc. is a wholly owned subsidiary of Cumulus Media Inc. Cumulus Media New Holdings Inc. is not aware of any publicly held corporation that holds 10% or more of the stock of Cumulus Media Inc., Cumulus Media Intermediate Inc., or Cumulus Media New Holdings Inc. Cumulus is currently in bankruptcy proceedings, and Cumulus will update the Court if its corporate ownership changes.

# TABLE OF CONTENTS

Page


CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ v

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 3

ISSUES PRESENTED ................................................................................. 3

STATEMENT OF THE CASE ...................................................................... 4

I. FACTUAL BACKGROUND ...................................................................... 4

A. Radio Broadcasters Sell Advertising Inventory ................................. 4

B. The Parties ....................................................................................... 4

C. Nielsen Adopts A Tying Policy ......................................................... 5

II. PROCEDURAL HISTORY ..................................................................... 7

A. The District Court Enters A Preliminary Injunction .......................... 7

B. This Court Affirms ........................................................................... 8

C. Nielsen Defies The Injunction ......................................................... 10

D. The District Court Enforces The Injunction ..................................... 11

E. Cumulus Loses Access To Nationwide After The Motions Panel Stays The Enforcement Order ............................................... 14

STANDARD OF REVIEW ......................................................................... 16

SUMMARY OF ARGUMENT .................................................................... 16

ARGUMENT .......................................................................................... 20

I. THE COURT LACKS JURISDICTION OVER THIS INTERLOCUTORY APPEAL .............................................................. 20

**TABLE OF CONTENTS—Continued**

Page

A. The Enforcement Order Is Not Immediately Appealable.................20

B. This Court Should Reject Nielsen's Arguments That The Enforcement Order Modifies The Injunction ..................................25

1. Nielsen misstates the standard of review .................................25

2. The enforcement order does not grossly misinterpret the injunction by requiring Nielsen to offer Nationwide at a commercially reasonable rate .........................26

3. The enforcement order does not grossly misinterpret the injunction by applying its plain terms................................32

4. The enforcement order does not grossly misinterpret the injunction by concluding that Nielsen's "rate" encompasses a price over a period of time ...............................33

5. The enforcement order does not exceed the mandate...............35

II. EVEN IF THIS COURT HAD JURISDICTION, NIELSEN OFFERS NO GROUND TO REVERSE THE ENFORCEMENT ORDER ....................................................................37

A. The Order Does Not Impermissibly Modify The Injunction Because It Maintains The Status Quo .............................37

1. The District Court did not abuse its discretion in finding that Nielsen violated the injunction..............................38

2. To the extent the court modified its injunction to address Nielsen's violation, that modification maintained the status quo .......................................................41

3. The District Court was not required to issue new findings that Cumulus was likely to succeed and suffer irreparable harm absent a modification ..........................44

B. The Enforcement Order Does Not Violate Antitrust Law ...............46

**TABLE OF CONTENTS—Continued**

Page


C. The District Court Did Not Abuse Its Discretion In Stating That It Would Charge Nielsen A Daily Fine For Noncompliance ........................................................................ 53

III. IF THIS COURT AGREES WITH NIELSEN ON ANY GROUND, IT SHOULD EITHER MODIFY THE ORDER OR REMAND WITH CLEAR GUIDANCE.......................................... 58

CONCLUSION ............................................................................................ 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Hill*,
707 F.2d 780 (4th Cir. 1983) ....................54

*Amara v. Cigna Corp.*,
53 F.4th 241 (2d Cir. 2022) ....................20

*Berger v. Heckler*,
771 F.2d 1556 (2d Cir. 1985) ....................*passim*

*Birmingham Fire Fighters Ass'n 117 v. Jefferson County*,
280 F.3d 1289 (11th Cir. 2002) ....................22, 27, 30

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981)....................20

*CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*,
158 F.4th 368 (2d Cir. 2025) ....................37

*Cumulus Media New Holdings Inc. v. Nielsen Co. (US), LLC*,
182 F.4th 108 (2d Cir. 2026) ....................*passim*

*Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*,
No. 22-2106, 2024 WL 2712636 (2d Cir. May 28, 2024)....................21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)....................31

*EEOC v. New York Times Co.*,
196 F.3d 72 (2d Cir. 1999) ....................55, 56

*Epic Games, Inc. v. Apple Inc.*,
161 F.4th 1162 (9th Cir. 2025) ....................59

*Estle v. Int'l Bus. Machs. Corp.*,
23 F.4th 210 (2d Cir. 2022) ....................26

*FTC v. Zurixx*,
26 F.4th 1172 (10th Cir. 2022) ....................58

## TABLE OF AUTHORITIES—Continued

Page(s)

*Ginsberg Mach. Co. v. J. & H. Label Processing Corp.*,
341 F.2d 825 (2d Cir. 1965) ....................................................................34

*Hatten-Gonzales v. Hyde*,
579 F.3d 1159 (10th Cir. 2009) ......................................................21, 23, 24, 28

*Henrietta D. v. Giuliani*,
246 F.3d 176 (2d Cir. 2001) ....................................................................20

*Hughes v. United States*,
342 U.S. 353 (1952)..................................................................................31

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006)......................................................................................3

*In re City of New York*,
607 F.3d 923 (2d Cir. 2010) ....................................................................37

*In re Google Play Store Antitrust Litig.*,
147 F.4th 917 (9th Cir. 2025) ..................................................................48

*In re Hunt*,
754 F.2d 1290 (5th Cir. 1985) ..................................................................57

*In re Lisse*,
905 F.3d 495 (7th Cir. 2018) ......................................................................8

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017) ..............................................................*passim*

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)..................................................................................53

*JLM Couture, Inc. v. Gutman*,
91 F.4th 91 (2d Cir. 2024) ...............................................................*passim*

*JLM Couture, Inc. v. Gutman*,
616 F. Supp. 3d 359 (S.D.N.Y. 2022) ......................................................44

*Johnson v. Holder*,
564 F.3d 95 (2d Cir. 2009) ......................................................................45

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Jok v. City of Burlington*,
96 F.4th 291 (2d Cir. 2024) ....................................................................21

*King v. Allied Vision, Ltd.*,
65 F.3d 1051 (2nd Cir. 1995) ..................................................................29

*LaShawn A. v. Barry*,
87 F.3d 1389 (D.C. Cir. 1996)..................................................................45

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*,
969 F.2d 1384 (2d Cir. 1992) ....................................................................8

*Mamma Mia's Trattoria, Inc. v. Original Brooklyn Water Bagel Co.*,
768 F.3d 1320 (11th Cir. 2014) ................................................................23

*Marsh USA LLC v. Parrish*,
No. 25-cv-6208 (GBD), 2026 WL 2767113 (S.D.N.Y. Sept. 17, 2026) ..........................................................................................................45

*Morales Feliciano v. Rullan*,
303 F.3d 1 (1st Cir. 2002)........................................................................22

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978)..................................................................................49

*Official Airline Guides, Inc. v. FTC*,
630 F.2d 920 (2d Cir. 1980) .....................................................................49

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)...........................................................................47, 48

*Perez v. Danbury Hospital*,
347 F.3d 419 (2d Cir. 2003) .....................................................................29

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
673 F.2d 53 (2d Cir. 1982) .......................................................................53

*RES-GA Cobblestone, LLC v. Blake Constr. & Dev., LLC*,
718 F.3d 1308 (11th Cir. 2013) ..........................................................56, 57

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Rodriguez v. Swank*,
496 F.2d 1110 (7th Cir. 1974) ....................................................53, 54

*Rothenberg v. Sec. Mgmt. Co.*,
667 F.2d 958 (11th Cir. 1982) ...........................................................8

*Sears, Roebuck & Co. v. Mackey*,
351 U.S. 427 (1956)........................................................................20

*SEC v. Yi Xia*,
No. 21-CV-5350 IPKC) (JAM), 2024 WL 3447849 (E.D.N.Y. July 9, 2024) ...........................................................................42, 45

*Sierra Club v. U.S. Army Corps of Eng'rs*,
732 F.2d 253 (2d Cir. 1984) ..........................................36, 37, 43, 44

*Smith v. Woosley*,
399 F.3d 428 (2d Cir. 2005) ...........................................................59

*Southern Ute Indian Tribe v. Leavitt*,
564 F.3d 1198 (10th Cir. 2009) .......................................................22

*Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*,
385 U.S. 23 (1966)..........................................................................36

*Twin Lab'ys, Inc. v. Weider Health & Fitness*,
900 F.2d 566 (2d Cir. 1990) ...........................................................48

*United States v. Armour & Co.*,
402 U.S. 673 (1971)........................................................................34

*United States v. Chai*,
3 F. App'x 941 (10th Cir. 2001) ......................................................57

*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ..............................................48

*United States v. Loew's, Inc.*,
371 U.S. 38 (1962)..................................................................*passim*

**TABLE OF AUTHORITIES—Continued**

Page(s)

*United States v. Paccione*,
964 F.2d 1269 (2d Cir. 1992) ....................57

*United States v. Philip Morris USA Inc.*,
686 F.3d 839 (D.C. Cir. 2012)....................36

*United States v. Trenton Potteries Co.*,
273 U.S. 392 (1927)....................52

*United States v. Visa U.S.A., Inc.*,
No. 98 CIV. 7076 (BSJ), 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ....................55, 56

*United States v. Zakharia*,
418 F. App'x 414 (6th Cir. 2011) ....................57

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................18, 48

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
423 F.3d 137 (2d Cir. 2005) ....................*passim*

*Weston Cap. Advisors, Inc. v. PT Bank Mutiara*,
667 F. App'x 15 (2d Cir. 2016) ....................58

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
339 F.3d 101 (2d Cir. 2003) ....................39

**Statutes**

15 U.S.C. § 2....................7

28 U.S.C. § 1291....................16, 20

28 U.S.C. § 1292(a)(1)....................*passim*

28 U.S.C. § 2106....................59

**TABLE OF AUTHORITIES—Continued**

Page(s)

**Other Authorities**

*Rate*, Oxford English Dictionary (online ed.), https://www.oed.com/dictionary/rate_n1?tab=meaning_and_use#26707259....................34

16 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice & Procedure: Jurisdiction § 3924.2 (3d ed. 2026 update)....................21

## INTRODUCTION

Four months ago, a unanimous panel of this Court held that Cumulus Media New Holdings Inc. ("Cumulus") was substantially likely to succeed in demonstrating that The Nielsen Company (US) LLC ("Nielsen") violated antitrust law. *See Cumulus Media New Holdings Inc. v. Nielsen Co. (US), LLC*, 182 F.4th 108, 128-132 (2d Cir. 2026). Nielsen uses coercive pricing to tie its national radio ratings data product, called Nationwide—over which Nielsen enjoys a monopoly—to local radio ratings data. This Court affirmed the preliminary injunction the District Court crafted to restrain this anticompetitive conduct, holding that the injunction's prohibition on "charging a commercially unreasonable rate" is appropriately tailored to remedy the irreparable harm. That harm stems from Nielsen's obstruction of Cumulus's "ability to properly negotiate and thereby obtain" Nationwide. *See id.* at 138, 140.

Nielsen violated that injunction as soon as it took effect. Nielsen offered its product to Cumulus for a price "*20 times higher* than the highest price paid by any customer who only purchases standalone Nationwide," SA103[1] (emphasis added), and for a time period Nielsen admitted is not the industry standard. As the District

[1] This brief refers to Nielsen's sealed appendix as "SA," Nielsen's appendix as "A," and Cumulus's supplemental sealed appendix as "Supp. SA." References to "No. 26-88 Supp. A" and "No. 26-88 Supp. SA" are to Cumulus's supplemental appendix and sealed supplemental appendix in *Cumulus v. Nielsen*, No. 26-88, Dkt. Nos. 55, 67 & 68.

Court found after an evidentiary hearing, that rate was so commercially *unreasonable* that it led the Court to doubt Nielsen's "good faith." SA113. To address Nielsen's intransigence, the Court entered a narrow order directing Nielsen to make an offer for Nationwide at a commercially reasonable rate and threatening daily fines for noncompliance.

Nielsen now attempts to appeal that straightforward enforcement order. But this Court lacks appellate jurisdiction unless the order grossly or obviously misinterpreted the injunction. The order comes nowhere close. It directs Nielsen to fix its failure to comply with the injunction by offering its product at a reasonable rate. Nielsen is not being compelled to sell. Nielsen has repeatedly demonstrated it wants to do business with Cumulus. It even made an (unreasonable) offer to Cumulus after the enforcement order was administratively stayed. The order instead implements the injunction by requiring Nielsen to offer a commercially reasonable rate.

If this Court concludes it has jurisdiction, it should affirm. Even if the order modifies the injunction, it has no impact on the District Court's findings—affirmed by this Court—of substantial likelihood of success on the merits and irreparable injury, and instead at most modifies the *remedy* selected by the District Court. The District Court is permitted "[t]o ensure ... that relief is effectual," including by regulating "otherwise permissible practices connected with the acts found to be illegal." *Cumulus*, 182 F.4th at 139 (quoting *United States v. Loew's, Inc.*, 371 U.S. 38, 53

(1962), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). Threatened fines are a traditional means of coercing compliance that can be imposed "even absent a finding of contempt." *Berger v. Heckler*, 771 F.2d 1556, 1569 (2d Cir. 1985).

The stakes are high, and Cumulus is in urgent need of relief. The enforcement order has been stayed pending appeal. By the time of argument, Cumulus will have been without Nationwide for two months, and it will have [redacted] and other customers as a result. Supp. SA81. That harm is irreparable, as is the ongoing loss of goodwill, customers, and market share by a business that is already in bankruptcy. Cumulus's [redacted] as a result of Nielsen's anticompetitive conduct. Supp. SA87. Cumulus respectfully requests that this Court promptly affirm, or if it reverses, offer clear guidance to the District Court regarding how to enforce the injunction.

## JURISDICTIONAL STATEMENT

For the reasons explained in Part I, this Court lacks jurisdiction over this appeal.

## ISSUES PRESENTED

1. Whether the Court should dismiss this interlocutory appeal from an order enforcing a preliminary injunction, which is not immediately appealable under 28 U.S.C. § 1292(a)(1).

2. Whether the District Court was within its discretion, after finding that Nielsen had violated its injunction, to direct Nielsen to make an offer at a commercially reasonable rate with the threat of daily fines for noncompliance.

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

#### A. Radio Broadcasters Sell Advertising Inventory.

The radio broadcasting industry consists of national networks that provide radio programming across the United States and local radio stations that serve smaller geographic areas. SA3. Both national networks and local broadcasters generate revenue by selling commercial time, called "advertising inventory," to advertisers and advertising agencies. *See Cumulus*, 182 F.4th at 117.

Before purchasing advertising inventory, advertisers need to know what audience they will reach. Ratings data measure the size and demographics of the broadcast's audience, the time spent listening, and the broadcast's overall "reach." No. 26-88 Supp. SA67-68 ¶ 28. National ratings data measure the performance of nationwide broadcasts, and local ratings data assess specific markets. *Cumulus*, 182 F.4th at 117. Most advertisers rely on broadcasters to share ratings data before they will purchase advertising inventory. No. 26-88 Supp. SA251-252 ¶ 32.

#### B. The Parties.

Cumulus has a national network, Westwood One, that provides programming to thousands of stations nationwide. *See Cumulus*, 182 F.4th at 117. Cumulus also

owns or operates 395 local stations in 84 markets. *See id.*; SA4. Cumulus's networks and stations earn revenue by selling advertising inventory. *See Cumulus*, 182 F.4th at 117.

Nielsen is the dominant "market research company that collects, analyzes, and sells radio ratings data." *Id.* at 117. Nielsen measures audience behaviors and listening trends both nationally and across "more than 270 geographic areas." Nielsen has "no competitors in the market for national radio ratings data, in which it enjoys a 100% market share." *Id.* Not having access to Nationwide has and will continue to impose serious financial consequences on Cumulus. SA41; Supp. SA80-85 ¶¶ 7-23, Supp. SA 87 ¶ 33.

Nielsen is also the dominant provider of local radio ratings data. That market has only one potential competitor to Nielsen: Eastlan. *See Cumulus*, 182 F.4th at 117. Eastlan's sales of local radio ratings data account for [redacted] the market. No. 26-88 Supp. SA231-232. However, Nielsen views Eastlan as a growing competitive threat. No. 26-88 Supp. SA255 ¶¶ 45-47.

### C. Nielsen Adopts A Tying Policy.

The radio industry is in decline. No. 26-88 Supp. A9-10. Nielsen has nevertheless continued increasing its prices. SA8. These continued price hikes have caused broadcasters to search for alternatives. *Id.* Eastlan has stepped into the gap,

and it has begun winning contracts that would otherwise go to Nielsen. No. 26-88 Supp. SA254-255 ¶¶ 42, 45.

Concerned that its customers would switch to Eastlan, Nielsen implemented its Network Policy, which seeks to "command subscriptions in local markets." *Cumulus*, 182 F.4th at 118 (quoting No. 26-88 Supp. SA440). This policy requires broadcasters who operate both local and national stations to purchase Nielsen's local data in order to access Nationwide. *Id.*

Cumulus has long purchased Nationwide and local data in 76 local markets from Nielsen. In 2025, as its then-current contract neared expiration, Cumulus "determined that the cost of Nielsen's local ratings data had outstripped their value in most local radio markets" and thus decided to "switch to Eastlan—a lower-cost alternative—in at least some of those markets." *Id.*

In response, Nielsen applied its tying policy to Cumulus, stating that "it would sell the full version of Nationwide only if Cumulus also subscribed to all local markets in which Cumulus operates." *Id.* at 119. Then, after Cumulus sent a cease-and-desist letter pointing out Nielsen's anticompetitive conduct, Nielsen purported to "exempt[] Cumulus from the Network Policy by offering, for the first and only time in the negotiations, a price for Nationwide as a standalone product"—one that was "ten times more than what Cumulus was paying for Nationwide under its existing contract." *Id.* (citation omitted). When it became clear that Nielsen would continue

to coerce Cumulus into purchasing products it did not want in violation of antitrust law, Cumulus filed this suit.

## II. PROCEDURAL HISTORY

### A. The District Court Enters A Preliminary Injunction.

In October 2025, Cumulus filed this lawsuit alleging that Nielsen had violated Section 2 of the Sherman Act, 15 U.S.C. § 2. *See Cumulus*, 182 F.4th at 119. After a three-day evidentiary hearing, the District Court granted a preliminary injunction. *See id.* Applying "the more demanding standard for mandatory injunctions," *id.* at 120, the court found that Cumulus was substantially likely to succeed in showing that Nielsen's conduct constituted unlawful "tying" that would irreparably injure Cumulus's relationships with advertisers, goodwill, and market share, and push Cumulus toward financial collapse. *See* SA32, SA41-42.

Based on these findings, the District Court enjoined Nielsen from "enforcing its Network Policy" and from "charging a commercially unreasonable rate for its Nationwide Report as a complete, standalone product." SA47. The order carved out a safe harbor, which found it presumptively reasonable for Nielsen to charge Cumulus "a rate that is equal to or lower than the highest annual 2026 rate Nielsen charges any broadcaster (whether Network or local) for Nationwide." *Id.* This safe harbor provided Nielsen with a straightforward way to comply with the injunction, as this Court found. *See Cumulus*, 182 F.4th at 139.

### B. This Court Affirms.

Nielsen appealed, and this Court stayed the injunction pending appeal. *See Cumulus*, 182 F.4th at 121.

During briefing, Cumulus filed for Chapter 11 bankruptcy, identifying "the situation with Nielsen" as one of the factors leaving it "with limited transaction alternatives outside of a comprehensive restructuring transaction." *In re Cumulus Media Inc.*, No. 26-90346, Dkt. 15 ¶ 12 (Bankr. S.D. Tex. 2026);[2] *accord id.* ¶ 72 (identifying "the Nielsen network tying policy" as one reason Cumulus filed for bankruptcy). Other factors include "persistent industry-wide declines in core radio broadcast advertising revenues." *Id.* ¶ 3.

This Court affirmed the injunction in full. *See Cumulus*, 182 F.4th at 140. It found that Cumulus was substantially likely to succeed on the merits because "Nielsen's non-cost justified and 'exorbitant' standalone offer for Nationwide within the context of negotiations here rises to the level of coercion by effectively forcing Cumulus to purchase unwanted local markets data." *Id.* at 128. As the Court explained, "Cumulus repeatedly pressed its desire to purchase Nationwide with only a subset of the local data markets, and Nielsen steadfastly refused to make such an offer." *Id.*

[2] This Court may take judicial notice of the bankruptcy filings. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992); *accord In re Lisse*, 905 F.3d 495, 496 (7th Cir. 2018) (Easterbrook, J., in chambers); *Rothenberg v. Sec. Mgmt. Co.*, 667 F.2d 958, 961 n.8 (11th Cir. 1982).

at 131-132. "In that context, Nielsen's eventual exorbitant offer for standalone Nationwide was not a 'bartering ploy[],' but a continuation of the same coercion." *Id.* at 132. This Court affirmed the District Court's other findings, including on irreparable harm. *See id.* at 135-136.

This Court rejected Nielsen's other challenges to the injunction. The Court held that the injunction was sufficiently specific in light of its safe harbor, which permits Nielsen to "determine a presumptively reasonable rate to charge Cumulus by surveying the prices it charges other large network clients." *Id.* at 139. This Court stated that it was "not persuaded by Nielsen's argument that relief in this context cannot regulate a product's price, since '[t]o ensure ... that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined.'" *Id.* (quoting *Loew's, Inc.*, 371 U.S. at 53).

This Court "disagree[d] with Nielsen that the district court's injunction will not remedy Cumulus's claimed harms." *Id.* at 140. Cumulus's harms stem from its "impending loss of access to" Nationwide, the Court explained, and "Cumulus alleges … that the Network Policy impeded its ability to properly *negotiate* and thereby obtain that product." *Id.* (emphasis added). "Here, the district court's injunction is tailored to the conduct it found to be unlawful: Nielsen's express and constructive enforcement of its Network Policy." *Id.* And because that was the

"anticompetitive conduct" Nielsen employed "during negotiations," the "injunction is sufficiently tailored to remedy Cumulus's harm." *Id.*

### C. Nielsen Defies The Injunction.

This Court issued its opinion a little less than two months before Cumulus would lose access to Nationwide. After the opinion issued, Cumulus requested that Nielsen offer a commercially reasonable rate for Nationwide. *See* D. Ct. Dkt. 187 at 1. Nielsen instead filed an en banc petition, No. 26-88 Dkt. 92, and refused to negotiate until this Court issued the mandate *despite* this Court's express vacatur of the stay, *see Cumulus*, 182 F.4th at 140.

After this Court denied Nielsen's en banc petition and issued the mandate, *see* No. 26-88, Dkt. 92, Nielsen still refused to comply. Nielsen initially refused to even make an offer. Cumulus thus made its own offer for [redacted] SA103.[3] Nielsen countered at [redacted], the equivalent [redacted] SA106. The price for that abbreviated contract was "over *20 times higher* than the highest price paid by any customer who only purchases standalone Nationwide," SA103 (emphasis added), and [redacted] than what Nielsen charged Cumulus for Nationwide (alongside local ratings data) under its last contract. SA103

[3] The price for Nationwide under the prior contract is clearly delineated as a separate line item. *See* No. 26-88 Supp. SA429.

& n.1. Cumulus countered at [redacted] SA106—a price higher than what Cumulus paid for Nationwide under its last contract. Nielsen rejected the offer.

After Cumulus moved to enforce the injunction, Nielsen "lowered its offer to [redacted] for a [redacted]," or the equivalent of [redacted] SA106. This rate is higher than Westwood One's entire expected cash flow for 2026. *See* Supp. SA86-87 ¶ 32. Cumulus has already engaged in a multi-year cost-cutting program, and any further cost-cutting will lead to [redacted] *See* Supp. SA87 ¶ 33.

In response to Nielsen's [redacted] rate, as a last-ditch attempt to secure Nationwide and prevent imminent loss of customers, "Cumulus counter-offered [redacted]" SA106. Nielsen declined.

### D. The District Court Enforces The Injunction.

Cumulus moved to enforce the injunction, contending that Nielsen's proposed [redacted] offer was commercially unreasonable. *See* SA97-98. Nielsen based that offer—and its subsequent [redacted] offer—on a model created by an expert, Dr. Zmijewski. This model was meant to estimate a commercially reasonable price for standalone Nationwide. *See* SA103-106. As the District Court explained, "[t]he commercial reasonableness of Nielsen's [redacted] offer

for standalone Nationwide"—which by the time of the decision was Nielsen's current offer—"comes down to the soundness of Dr. Zmijewski's model and of Nielsen's proposed [redacted]." SA108.

The court found both unsound. Dr. Zmijewski had created a regression analysis to evaluate the reasonableness of Nielsen's price for Nationwide. SA104. The court found that this analysis was fatally flawed. For one thing, the model was based in part on contract prices paid by a sample of Nielsen's customers, but "[t]he vast majority of customers in [this] analysis do not purchase Nationwide at all, so Nationwide price is not a component of their contract price." SA-104-105. Moreover, in providing his opinion and constructing his model, Dr. Zmijewski admitted he did not review the court's opinions or court transcripts, interview Nielsen's customers, review Nielsen's ordinary course of business documents, conduct his own assessment of Nielsen's production costs, or use Westwood One's up-to-date revenue figures. *See* SA104-106, SA109-110; Supp. SA2-45 (hearing transcript).

Worse yet, Nielsen's expert made a series of "dubious" assumptions that undermined his analysis. SA109. Among other errors, he "assumed no unlawful monopoly conduct affected the prices or products that Nielsen's customers purchased," but admitted that "if there is a monopoly and it's illegal, and there was price pressure that was put on customers, that is something I would consider." SA105. That ad-

mission was fatal both because of the District Court's findings with respect to Nielsen's anticompetitive behavior, and because one of the customers included in the expert's model entered into a contract while Nielsen's anticompetitive tying policy was in place, which the District Court found "likely impacted Dr. Zmijewski's calculations" and "skewed the inputs into his model." SA109. The expert also assumed that Nationwide and local data were equally valuable to Nielsen's customers. *Id.* That is contrary to the very premise of this case—that Cumulus does not value Nielsen's local data but wants to buy Nationwide. *See supra* p. 6.

For all these reasons, the District Court concluded that these "serious deficiencies" rendered the expert's model "unreliable." SA113. The court emphasized "[t]hat the price offered by Nielsen is many multiples above the presumptively reasonable safe harbor rate *further calls into question Nielsen's good faith*." *Id.* (emphasis added).

The court also found that Nielsen's proposed [redacted] was commercially unreasonable. SA112. "The record makes clear that the standard is, and commercially reasonable rates in this industry are, based upon multi-year contracts." SA112-113. Nielsen "agree[d] that a [redacted] is not the industry standard." SA112. The court recognized that Nielsen may sometimes offer [redacted] in certain idiosyncratic circumstances," but the court concluded that Nielsen

"it has not offered a convincing explanation of why it has deviated from the typical contract term in this case." *Id.*

The court concluded "that Cumulus has demonstrated that Nielsen's latest offer is commercially unreasonable and thus in violation of the Court's order." SA113. "To prevent unfair prejudice and irreparable harm to Cumulus, which" was "on the cusp of losing access to an essential service while it attempts to emerge from Chapter 11 bankruptcy," the court ordered Nielsen "to offer its Nationwide Report as a standalone product to Cumulus for a commercially reasonable rate by September 10, 2026 at 3:00 p.m." or face sanctions of "$50,000 per day until it comes into compliance." *Id.*

### E. Cumulus Loses Access To Nationwide After The Motions Panel Stays The Enforcement Order.

Nielsen appealed and sought an emergency stay. *See* Dkt. 10. At 3:00 p.m., the moment when Nielsen became subject to fines, Nielsen offered to sell Nationwide to Cumulus for [redacted] *See* Supp. SA46-47. This is the same price Cumulus earlier proposed, and Cumulus was prepared to accept the basic terms of this offer.

At 3:11 p.m., however, this Court issued an administrative stay and Nielsen promptly withdrew its offer. Supp. SA46. That same day, Cumulus lost access to Nationwide.

On September 11, at oral conference, Judge Lohier asked the parties if they could reach an agreement. In an effort to reach a resolution, Cumulus offered to purchase Nationwide at [redacted] Supp. SA48. [redacted] and was intended to address any claimed economic harm by Nielsen during the pendency of this appeal. *Id.* Nielsen countered that, if it succeeds in its appeal, the rate should be "adjusted retroactively" to the [redacted] the District Court found unreasonable. Supp. SA53-54.

On September 16, the motions panel stayed the enforcement order and ordered expedited briefing. *See* Dkt. 3. In light of the stay, the parties have been unable to reach an agreement. Nielsen continues to adhere to its unreasonable demand, and Cumulus continues to suffer irreparable harm.

The day the stay took effect, Westwood One's [redacted] stated that if it does not have access to Nationwide by the first week of November, it will not purchase advertising placements from Westwood One for 2027 that it would otherwise purchase. *See* Supp. SA81-82 ¶¶ 8-11. By the time of this Court's argument, that harm will have come to pass. The loss of Cumulus's [redacted] will have

both immediate effects on Cumulus's bottom line and long-term effects, as this customer has told Cumulus that [redacted] Supp. SA82-83 ¶ 14. Other advertisers have similarly told Cumulus that they will move advertising from Westwood One without Nationwide. *See* Supp. SA83 ¶ 15.

Cumulus is suffering similar harms to its customer base, goodwill, and reputation every day the stay is in effect. *See Cumulus*, 182 F.4th at 136; Supp. SA80-85 ¶¶7-23. Cumulus thus respectfully asks this Court to issue its judgment and mandate as soon as practicable, and if necessary before issuing an opinion, to address Cumulus's ongoing irreparable injury.

## STANDARD OF REVIEW

This Court determines whether an enforcement order modifies an injunction for purposes of 28 U.S.C. § 1292(a)(1) by considering whether the order is "an 'obvious or blatant' misinterpretation [that] rises to the level of a modification permitting interlocutory review." *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 100 (2d Cir. 2024) (quoting *In re Tronox Inc.*, 855 F.3d 84, 99 (2d Cir. 2017)).

This Court reviews orders modifying preliminary injunctions and the District Court's choice of how to enforce its order for abuse of discretion. *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 141 (2d Cir. 2005) (modifications); *Tronox*, 855 F.3d at 112 (means of enforcement).

## SUMMARY OF ARGUMENT

**I.A.** This Court lacks appellate jurisdiction. An order enforcing a preliminary injunction is neither a final order appealable under 28 U.S.C. § 1291 nor an interlocutory order appealable under 28 U.S.C. § 1292(a)(1). Nielsen thus attempts to cast the enforcement order as modifying the injunction. But an enforcement order becomes an immediately appealable modification only when it obviously or blatantly misinterprets the injunction beyond its original scope. The order does not meet that standard: The District Court reasonably interpreted the injunction to require Nielsen, once it made an offer at a commercially unreasonable rate, to fix its prior offer and offer a commercially reasonable rate.

**B.** This Court should reject Nielsen's attempts to turn a straightforward order enforcing an injunction into a modification of the injunction. The status quo prior to the injunction was Nielsen offering Nationwide to Cumulus at a commercially unreasonable rate. The mandatory injunction upheld by this Court altered that status quo by forbidding Nielsen from continuing its anticompetitive behavior. An order directing Nielsen to make an offer at a commercially reasonable rate—after

violating the injunction by offering a commercially *unreasonable* rate—is firmly within the scope of the mandatory injunction. Contrary to Nielsen's contentions, the order in no way compels a sale; Nielsen has repeatedly demonstrated it wants to make a sale but disagrees on price.

The enforcement order likewise did not grossly misinterpret the injunction when it found that Nielsen's offer violated the injunction. Nielsen's argument that its offer could not violate the injunction because there was no "bundle on the table," Br. 26, is incompatible with the face of the injunction, which requires only that the District Court assess whether Nielsen has offered a commercially unreasonable rate for standalone Nationwide. And Nielsen's argument that the injunction's "rate" requirement does not include a duration requirement is, in the District Court's words, "disingenuous." SA112. For the same reasons, the enforcement order does not modify the injunction by exceeding this Court's mandate.

**II.** If this Court has jurisdiction, it should affirm.

**A.** If the District Court modified the injunction by directing Nielsen to make an offer, it did not abuse its discretion in doing so. The order effectuates the injunction and maintains the status quo set by the injunction, and is thus not an abuse of discretion under the standard governing modifications. The District Court had already found—and this Court affirmed—that Cumulus was substantially likely to

succeed on the merits and was suffering irreparable injury. The District Court was not required to make the same findings again before issuing its enforcement order.

**B.** The District Court's purported modification of the injunction did not violate antitrust law. The "refusal to deal" cases cited by Nielsen address situations where a company declines to do business with a *rival*. *See, e.g.*, *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004). Those cases are inapposite where Nielsen has consistently *chosen* to offer its product to a major *customer*, Cumulus, rather than being forced to supply a competitor. And even if the order had directed Nielsen to deal with Cumulus, that is an appropriate way to address Nielsen's violation of an injunction meant to preserve Cumulus's "ability to properly negotiate" for Nationwide, *Cumulus*, 182 F.4th at 140, and is permissible under *Loew's*, 371 U.S. at 55. Nielsen's contention that the District Court impermissibly set a rate is likewise refuted by the order's plain text and the simple fact that the court has never ordered Nielsen to charge any particular rate.

**C.** The District Court did not abuse its discretion by enforcing a purported modification to the injunction with daily fines for noncompliance, which are a standard means of coercing compliance. Nielsen's argument that the District Court could not impose this remedy without first finding Nielsen in contempt contradicts binding circuit precedent. *See Berger*, 771 F.2d at 1569.

**III.** If this Court agrees with Nielsen on any ground, it should either modify the order or offer clear guidance for the District Court on remand. Nielsen still refuses to comply with the injunction—which remains in effect and has not been stayed. Cumulus is suffering irreparable injury every day, including the loss of key customers. If this Court reverses, it should do so with instructions to the District Court on how to enforce the injunction, preventing yet another trip to this Court on an emergency motion.

## ARGUMENT

### I. THE COURT LACKS JURISDICTION OVER THIS INTERLOCUTORY APPEAL.

#### A. The Enforcement Order Is Not Immediately Appealable.

Every appeal must begin "with a simple question: Has Congress given [the Court] authority to hear and decide this matter?" *Tronox*, 855 F.3d at 95. Since 1789, the default rule has been "that only *final* decisions of the federal district courts would be reviewable on appeal." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981) (citing 28 U.S.C. § 1291). This rule enshrines the "historic federal policy against piecemeal appeals," *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438 (1956), which "preserves the proper balance between trial and appellate courts, minimizes the harassment and delay that would result from repeated interlocutory appeals, and promotes the efficient administration of justice," *Amara v. Cigna Corp.*, 53 F.4th 241, 248 (2d Cir. 2022) (citation omitted). This rule is subject to certain "limited

exception[s]," *Carson*, 450 U.S. at 84, including appeals from orders "continuing, modifying, refusing or dissolving injunctions," 28 U.S.C. § 1292(a)(1). Interlocutory appeals that do not fall within this category, or other narrow exceptions, must be dismissed. *See Tronox*, 855 F.3d at 89.

This is one such appeal. An order enforcing a preliminary injunction is not final under § 1291. *See Henrietta D. v. Giuliani*, 246 F.3d 176, 180 (2d Cir. 2001) ("A decision is 'final' for purposes of § 1291 if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" (citation omitted)). Nor is it immediately appealable under § 1292(a)(1). *See Tronox*, 855 F.3d at 97; *Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1170-71 (10th Cir. 2009); 16 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice & Procedure: Jurisdiction § 3924.2 (3d ed. 2026 update).

Nielsen, who bears the burden of establishing this Court's jurisdiction, *see Jok v. City of Burlington*, 96 F.4th 291, 293 (2d Cir. 2024), does not contest this. Nielsen instead tries to recast the order as modifying the preliminary injunction, which would make it appealable under § 1292(a)(1). *See* Br. 31.

That gambit fails. An enforcement order becomes an immediately appealable modification of an injunction only when it "extend[s] the Injunction beyond its original reach." *Tronox*, 855 F.3d at 98. An order does so when it "alters the legal

relationship between the parties, or substantially change[s] the terms and force of the injunction." *Weight Watchers*, 423 F.3d at 141-142 (citation omitted).

Crucially, "district courts are entitled to deference when interpreting their own injunctions, including an injunction's 'original reach.'" *JLM Couture*, 91 F.4th at 100; *see Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*, No. 22-2106, 2024 WL 2712636, at *4 (2d Cir. May 28, 2024) (summary order) (noting that "courts give heavy weight to" a district judge's interpretation of her own injunction (citation omitted)). "Only an 'obvious or blatant' misinterpretation rises to the level of a modification permitting interlocutory review." *JLM Couture*, 91 F.4th at 100; *see also Tronox*, 855 F.3d at 98 & n.19 (collecting cases from the Seventh, Tenth, Eleventh, and D.C. Circuits).

"To clear [that] jurisdictional hurdle, the misinterpretation must be such that it leaps from the page." *Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 280 F.3d 1289, 1293 (11th Cir. 2002). "Doubts as to the applicability of section 1292(a)(1) are to be resolved *against* immediate appealability." *Morales Feliciano v. Rullan*, 303 F.3d 1, 7 (1st Cir. 2002) (emphasis added). This highly deferential review "fulfill[s] the statutory goal of not 'letting piecemeal appeals, cloaked in the guise of jurisdictional inquiries, come in through the back door.'" *Tronox*, 855 F.3d at 98 (citation omitted); *see also Birmingham Fire Fighters*, 280 F.3d at 1293 ("To

plunge into the details would collapse the jurisdictional inquiry into a decision on the merits, thwarting the purpose of § 1292(a)(1).").

The enforcement order Nielsen is trying to appeal does not meet this "high" standard. *See Southern Ute Indian Tribe v. Leavitt*, 564 F.3d 1198, 1209 (10th Cir. 2009). The injunction "enjoin[s] and restrain[s]" Nielsen from "charging a commercially unreasonable rate for its Nationwide Report as a complete, standalone product." SA46-47. Nielsen did not comply with that order; it demanded a commercially unreasonable rate, including a commercially unreasonable price and a [redacted]. *See* SA112-113.

The District Court did not grossly misinterpret its injunction by concluding that the injunction required Nielsen—after it made a commercially *unreasonable* offer—"to offer its Nationwide Report as a standalone product to Cumulus for a commercially reasonable rate." SA113. The enforcement order simply "direct[s] compliance" with the injunction, *Tronox*, 855 F.3d at 96, by ordering Nielsen to try again. The "legal relationship between the parties," as well as the "terms and force of the injunction," remain identical before and after the order. *Weight Watchers*, 423 F.3d at 141-142. Nielsen was already precluded from charging Cumulus a commercially unreasonable rate. "The district court merely clarified that the existing prohibition applied to the specific facts presented," *Hatten-Gonzales*, 579 F.3d at 1170 (cleaned up)—that is, Nielsen's proposed [redacted] rate. The court

then "merely restated the parties' relationship in new terms." *Id.* Specifically, the District Court instructed Nielsen to correct its failure to comply with the injunction *in the only way that failure could be meaningfully corrected*—by making a new offer at a commercially reasonable rate.

Moreover, it is "instructive that the district court explained its own Enforcement Order as a *direct* application of the existing injunction, not an alteration of its sweep." *Mamma Mia's Trattoria, Inc. v. Original Brooklyn Water Bagel Co.*, 768 F.3d 1320, 1329 (11th Cir. 2014). The court expressly rejected Nielsen's argument that "any ruling rejecting the reasonableness of the term Nielsen offered would modify the Order." SA112.

Indeed, Nielsen does not explain *how else* the District Court could meaningfully enforce its injunction. Nielsen knows that Cumulus needs Nationwide and would be immediately and substantially irreparably harmed if it lost access to that product. *See Cumulus*, 182 F.4th at 117, 136. But Nielsen had made clear that it would not budge from its commercially unreasonable [redacted] demand, SA58 ¶ 19, even as the clock on Cumulus's access to that vital product ran out. The District Court appropriately recognized that the way to end this impasse and "cease[]" Nielsen's violation of the injunction was for Nielsen to offer a commercially reasonable rate. *See Hatten-Gonzales*, 579 F.3d at 1170; *Berger*, 771 F.2d at 1568 ("[A]

federal court's interest in orderly, expeditious proceedings … justifies any reasonable action taken by the court to secure compliance with its orders." (cleaned up)). Any other interpretation of the District Court's injunction would render it meaningless—which could not have been the District Court's intent.

The enforcement order vindicates, rather than modifies, an injunction this Court has already affirmed. This Court thus lacks jurisdiction and should dismiss this appeal.

### B. This Court Should Reject Nielsen's Arguments That The Enforcement Order Modifies The Injunction.

This Court should reject Nielsen's argument that the enforcement order is an immediately appealable modification of the injunction.

#### 1. Nielsen misstates the standard of review.

As a threshold issue, Nielsen misstates this Court's standard of review. Nielsen contends that the Court should determine *de novo* whether the District Court's order modified the injunction. *See* Br. 32. But this Court affords significant deference to a District Court's interpretation of the meaning of an injunction.

This Court applies *de novo* review only when "the language the district court is interpreting is tied to a term defined by law." *Tronox*, 855 F.3d at 99. For example, in *Tronox*, this Court considered the district court's interpretation of the term "Trust Derivative Claims" in an injunction. *See id.* The Court reviewed "*de novo* the District Court's conclusion that the … Plaintiffs' claims are in fact derivative

claims within a bankruptcy court's jurisdiction," because "'derivative claims' as used in the bankruptcy context" is a "term defined by law." *Id.* But the Court explained that "to the extent the District Court interpreted 'Trust Derivative Claims' to mean all derivative claims within a bankruptcy court's jurisdiction, its interpretation is entitled to deference and will not constitute a modification unless it is an obvious or blatant misinterpretation." *Id.* The Court was clear: "Injunctions tied to the factual circumstances of the parties that do not employ a legal principle to measure their scope will fall under the more deferential" gross or obvious misinterpretation "standard of review." *Id.* at 99 n.20.

The injunction here does not contain legal terms that require *de novo* review. Instead, Nielsen is disputing what it was required to do in response to the District Court's injunction. That is a fact question, which means this Court must review whether the District Court's understanding of the injunction is a gross or obvious misinterpretation. Indeed, Nielsen's failure to identify the specific terms in the injunction that it believes present a legal question worthy of *de novo* review constitutes waiver of that issue. *Estle v. Int'l Bus. Machs. Corp.*, 23 F.4th 210, 215 n.3 (2d Cir. 2022).

Nielsen claims that the enforcement order did not construe "the Injunction's text" based on a comment the District Court made at a motions conference. Br. 32. But at that conference the court squarely framed the question it faced: "has Nielsen

offered this product at a *commercially reasonable rate*" in line with "*what the PI requires*"? SA49 (emphasis added). The enforcement order answers that question by interpreting the injunction.

**2. The enforcement order does not grossly misinterpret the injunction by requiring Nielsen to offer Nationwide at a commercially reasonable rate.**

Applying this Court's highly deferential standard of review, the Court should reject Nielsen's contention that the enforcement order modified the injunction by "order[ing] Nielsen to make a new offer." Br. 25. "A court can take 'any reasonable action ... to secure compliance'" with an injunction, "and the 'scope of a district court's equitable powers to remedy past wrongs is broad.'" *Tronox*, 855 F.3d at 112 (citation omitted). Ordering Nielsen to make a commercially reasonable offer is well within the injunction's compass and certainly is not a flagrant misinterpretation of that injunction.

To begin, the directive to make a new offer is firmly within the injunction's scope. This Court concluded that the injunction is "mandatory" and "altered the status quo." *Cumulus*, 182 F.4th at 124. That status quo was Nielsen's offer of Nationwide at a commercially unreasonable rate, which "impeded [Cumulus's] ability to properly negotiate and thereby obtain that product." *Id.* at 128-132, 140. The injunction's prohibition on charging a commercially unreasonable rate thus necessarily requires Nielsen to take affirmative action by either offering a commercially

reasonable rate or accepting a commercially reasonable offer. Otherwise, the status quo would remain unchanged and the envisioned "proper[] negotiat[ions]" would never occur—and Cumulus could never "obtain" Nationwide. *Id.* at 140.

The District Court's directive that Nielsen do something contemplated by a mandatory injunction in no way extends that injunction "beyond its original reach," *Tronox*, 855 F.3d at 98, much less is so blatant a misinterpretation that it "leaps off the page," *Birmingham Fire Fighters*, 280 F.3d at 1293. District courts routinely direct recalcitrant defendants to take affirmative action to remediate a violation of an injunction without rendering that order an immediately appealable modification. *See, e.g., JLM Couture*, 91 F.4th at 100-101 (directing defendant to remove social-media posts that violated an injunction prohibiting certain marketing did not "modify … the injunction"); *Tronox*, 855 F.3d at 88-89, 112-113 (same, as to order directing plaintiffs to dismiss complaints filed in violation of "an injunction barring the litigation of claims that are derivative or duplicative of" certain other claims); *Hatten-Gonzales*, 579 F.3d at 1170 (same, as to order directing defendant to affirmatively "alter[] the application forms" it had modified in violation of an injunction prohibiting the defendant from "seeking [certain] information"). This case is no different.

It is Nielsen's interpretation of the injunction that is obviously wrong. According to Nielsen, "had Nielsen's offer violated the Injunction, the court could at most have ordered Nielsen to withdraw it and left the parties to negotiate *or part*

*ways*." Br. 25 (emphasis added). Nielsen's position that it can make a commercially unreasonable offer and then walk away would place the parties in the same exact position they were in before the mandatory injunction was entered. That is clearly wrong, as it would render the injunction meaningless and empower Nielsen to continue to violate antitrust law with impunity. *See Cumulus*, 182 F.4th at 140 (explaining that the injunction is appropriately tailored to "bar[] Nielsen from engaging in anticompetitive conduct").

Nielsen invokes this Court's statement that a court "may not impose obligations on a party that are not unambiguously mandated by the decree itself." Br. 25-26 (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2nd Cir. 1995)). But *King*, as well as *Perez v. Danbury Hospital*, 347 F.3d 419 (2d Cir. 2003) (cited at 26), concerned consent decrees, which are "the sole source of the parties' rights," *King*, 65 F.3d at 1058, and thus must be "narrow[ly] constru[ed]," *Perez*, 347 F.3d at 424; *see also Berger*, 771 F.2d at 1567-69. A preliminary injunction, in contrast, reflects the intention of the district court that imposed it, and the district court's interpretation of the injunction is accordingly afforded significant deference. *See supra* pp. 21. Regardless, a district court "can take 'any reasonable action … to secure compliance'" with either a consent decree or an injunction—just as the District Court did here. *Tronox*, 855 F.3d at 112 (quoting *Berger*, 771 F.2d at 1568).

Moreover, Nielsen's argument that the injunction does not permit the District Court to order Nielsen to make an offer overlooks that *Nielsen made an offer while subject to the injunction*. The injunction governs Nielsen's conduct during "negotiations." *Cumulus*, 182 F.4th at 140. Nielsen agrees; its certiorari petition seeking review of this Court's decision takes the position that the injunction "governs every offer Nielsen makes to Cumulus." *See* Pet. for Writ of Certiorari at 27, *The Nielsen Co. v. Cumulus Media New Holdings Inc.*, No. 26-370 (U.S. Sept. 15, 2026). There is thus no dispute that Nielsen's offers for standalone Nationwide were required to be commercially reasonable.

The question presented in this case is whether the District Court grossly misinterpreted the injunction to require Nielsen—once it made a commercially unreasonable offer—to address its non-compliance by offering a commercially reasonable rate. It is hard to see what is "blatantly or obviously wrong," *Birmingham Fire Fighters*, 280 F.3d at 1293, with the District Court's reaction to Nielsen's refusal to comply with the injunction by instructing Nielsen to try again.

Throughout these proceedings, Nielsen has consistently stated that it seeks to sell Nationwide to Cumulus. Nielsen extended at least eight offers to Cumulus before the District Court entered the injunction. *See Cumulus*, 182 F.4th at 117. During argument in this Court, counsel for Nielsen stated that it still wanted to "strike a deal." Oral Argument at 40:20-30, https://ww3.ca2.uscourts.gov/audio/26-88.mp3.

Judge Katzmann specifically asked whether Nielsen "would engage in further negotiations" with Cumulus, and counsel responded, "[a]bsolutely. Absolutely. 100%." *Id.* at 40:35-45.

Nielsen then did so. After this Court affirmed the injunction and returned the mandate to the District Court, the parties went back to the negotiating table and exchanged several more offers. *See supra* p. 10-11. In its brief in support of a stay pending appeal, Nielsen *again* acknowledged that it wanted to sell its product to Cumulus, it just disagreed about the price. *See* Dkt. 24 at 7. Even now, as Nielsen insists that it cannot be compelled to make an offer, it has never said that it does not want to sell its product to Cumulus. Nielsen wants a deal.[4]

Nielsen also claims that the order impermissibly "compel[s] a sale." Br. 27; *see id.* at 24, 28-32. That is plainly wrong. If Nielsen offers a commercially reasonable rate, but Cumulus does not accept, no sale will proceed. Nielsen thus has full discretion to set its rate—and to "decline to sell on terms it would not accept," Br. 33—as long as the rate is not commercially unreasonable. The fact that Nielsen opted to comply with the enforcement order by reverting to one of Cumulus's prior

[4] If Nielsen now seeks to avoid compliance with the antitrust law prohibition on tying by refusing to sell its product to any company that does not consent to the tie, that would constitute a clear violation of antitrust law. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ("A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product … .").

offers was its own decision. *Contra* Br. 27. Nielsen's freedom to pick a different commercially reasonable rate—and Cumulus's ability to refuse that rate—make this case unlike *Hughes v. United States* (cited at Br. 31), which concerned an order firmly requiring a sale by stating that the "trustee *shall* dispose of [the] stock" by a certain time. 342 U.S. 353, 356 (1952) (emphasis added).

Nielsen has represented to the Supreme Court, moreover, that the enforcement order is an *application* of the injunction, not a modification. In Nielsen's certiorari petition, it paints this Court's affirmance of the injunction as "commit[ting] federal courts to continuing rate administration," Pet. 24, which is the very same argument Nielsen makes with respect to the enforcement order, *see* Br. 40-45. Nielsen likewise warns the Supreme Court that "the enforcement proceedings" in the District Court "show[] what that looks like in practice"—"that" being the "*injunction forbidding 'commercially unreasonable' pricing*." Pet. 25 (emphasis added). This is further reason to reject Nielsen's contentions that the enforcement order modifies the injunction.

### 3. The enforcement order does not grossly misinterpret the injunction by applying its plain terms.

Nielsen appears to take the position that the injunction applies only where there is a "bundle on the table," and so Nielsen cannot violate the injunction as long as it offers Nationwide without a "bundle." Br. 26; *see also id.* at 38-39. This argument is incompatible with the plain text of the injunction, which seeks to address

Nielsen's anticompetitive conduct by forbidding it from charging a commercially unreasonable rate for Nationwide. This argument also conflicts with this Court's opinion, which explained that the injunction's prohibition on commercially unreasonable rates is appropriately "tailored" to addressing Nielsen's coercive pricing and "bar[s] Nielsen from engaging in anticompetitive conduct during negotiations." *See Cumulus*, 182 F.4th at 140. In this enforcement proceeding, the District Court therefore was not required to formally find that Nielsen's proposed rate was coercive; it instead properly evaluated whether Nielsen's rate was (wildly) commercially unreasonable, in violation of the injunction.

#### 4. The enforcement order does not grossly misinterpret the injunction by concluding that Nielsen's "rate" encompasses a price over a period of time.

Nielsen contends that the District Court misinterpreted the injunction by interpreting a commercially reasonable rate to include both a price and a "term" (or duration) requirement. Br. 28. The District Court rightly rejected this argument as "disingenuous." SA112. As the court explained, a duration requirement is embedded in the injunction's prohibition on charging "commercially reasonable '*rate[s]*.'" *Id.* (emphasis added); *see also* SA49 (District Court rejecting Nielsen's reading of the injunction and explaining that "[t]he question is, has Nielsen offered this product at a commercially reasonable rate").

The District Court's interpretation of the word "rate" to mean a price over a period of time is not wrong, much less "grossly wrong." As the court explained, "rates in this industry are[] based upon multi-year contracts." SA221. That is also how the parties have historically structured their contracts: Under Cumulus's most recent contract, Nielsen charged Cumulus an annual price for annual access to Nationwide. *See* No. 26-88 Supp. SA339. Indeed, duration is fundamental to these contracts because network advertising schedules are typically built on an annual basis—requiring broadcasters like Cumulus to access ratings data over an extended period of time ([redacted]). *See Ginsberg Mach. Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965) (explaining that an agreement's duration is an essential term where "it seriously affects the parties' rights and obligations"); No. 26-88 Supp. SA8-9 ¶ 32 ("[M]any advertising schedules are built on an annual basis … ."). Moreover, one of the definitions of "rate" is "[t]he relationship by which the amount or number of one thing corresponds proportionally to the amount or number of another," especially "*a unit of time*." *Rate*, Oxford English Dictionary (online ed.) (emphasis added).[5] The District Court did not grossly err by

[5] https://www.oed.com/dictionary/rate_n1?tab=meaning_and_use#26707259. Even if Nielsen disagrees with the District Court's interpretation of the word "rate," the court's interpretation of that word consistent with a common definition cannot be grossly wrong.

interpreting the word "rate" in line with both industry practice and a common dictionary definition.

Nielsen has no serious response. It faults the District Court for considering "industry practice," but that is an appropriate factor to consider when determining commercial reasonableness. Br. 28. It cites a case about consent decrees, *see id.* (citing *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)), which is inapposite for reasons discussed above, *see supra* p. 29. And Nielsen's statement that "Nationwide [redacted], so [redacted] covers the whole product," Br. 28, only confirms that a "rate" for that product necessarily incorporates a *term*.

**5. The enforcement order does not exceed the mandate.**

Finally, for these same reasons, Nielsen gets no mileage out of its notion that the enforcement order modified the injunction by exceeding the mandate. *See* Br. 29-31. This Court unanimously affirmed in full "a mandatory preliminary injunction that altered the status quo." *Cumulus*, 182 F.4th at 124. In so doing, this Court agreed with the District Court that Nielsen's anticompetitive conduct threatened to irreparably harm Cumulus by depriving it of "access to current national ratings data." *Id.* at 136. And this Court held that the injunction "is sufficiently tailored to remedy Cumulus's harm" because it prohibits Nielsen from engaging in the practices

that "impeded" Cumulus's "ability to properly negotiate and thereby obtain" Nationwide. *Id.* at 140. The enforcement order vindicates these rulings by creating the opportunity for proper negotiations to finally take place—and for Cumulus to actually "obtain" Nationwide. In contrast, Nielsen seeks to maintain the status quo prior to the District Court's injunction by *continuing* to charge a commercially unreasonable rate for Nationwide as a standalone product.

Nielsen's arguments to the contrary are unavailing. Nielsen invokes the District Court's comment that "Cumulus 'is not entitled to dictate the terms of a new contract'" and Cumulus's statement that "the Injunction 'does not set a price.'" Br. 29 (citations omitted). But Cumulus is not dictating the terms of the contract and neither the injunction nor the order set a rate; the District Court merely instructed Nielsen to charge a commercially reasonable rate in response to Nielsen's violation of the injunction.

* * *

The Supreme Court has cautioned that 28 U.S.C. § 1292(a)(1)'s exceptions to the final-judgment rule must be approached "somewhat gingerly lest a floodgate be opened." *Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23, 24 (1966). Accepting this appeal would blow the levees. District courts routinely enter orders enforcing preliminary injunctions, permanent injunctions, and other court orders. If the order at issue here is an immediately appealable modification—despite

doing nothing more than directing a recalcitrant defendant to remedy a violation by redoing something it has already done—this Court can "expect a regular pummeling of [its] docket with other supposed modifications." *United States v. Philip Morris USA Inc.*, 686 F.3d 839, 845 (D.C. Cir. 2012). This Court should dismiss for lack of jurisdiction under § 1292(a)(1).

This Court should also reject Nielsen's Hail Mary request to treat its brief "as a petition for a writ of mandamus and to grant the writ" if this Court concludes that it otherwise lacks jurisdiction. *See* Br. 6 n.1. This Court does "not consider an argument mentioned only in a footnote to be adequately raised" or preserved for appellate review. *CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 388 (2d Cir. 2025) (citation omitted). In any case, Nielsen does not explain why this is an "exceptional" case where mandamus is appropriate. *In re City of New York*, 607 F.3d 923, 932 (2d Cir. 2010). To the extent this Court finds Nielsen's footnote sufficient to constitute a petition for mandamus, this Court should deny it.

## II. EVEN IF THIS COURT HAD JURISDICTION, NIELSEN OFFERS NO GROUND TO REVERSE THE ENFORCEMENT ORDER.

If the Court concludes that it has jurisdiction, it should affirm. Nielsen's arguments for reversal are meritless: Nielsen misapplies the standard governing modifications of injunctions, misconstrues the order in contending that it violates antitrust law, and misunderstands circuit precedent in arguing that the threatened fines required a finding of contempt.

### A. The Order Does Not Impermissibly Modify The Injunction Because It Maintains The Status Quo.

As explained above, the enforcement order does not modify the injunction. But even if this Court determines that the order did modify the injunction, it should affirm. "The decision whether to modify a preliminary injunction involves an exercise of the same discretion that a court employs in an initial decision to grant or deny a preliminary injunction." *Weight Watchers*, 423 F.3d at 141. "The test of that discretion is measured by whether the requested modification effectuates or thwarts the purpose behind the injunction." *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984). "Thus, when reviewing an order modifying a preliminary injunction," this Court "look[s] to whether or not the *status quo* is maintained by the modification." *Id.*

To the extent this Court finds that the District Court modified the injunction, any such modification was permissible because Nielsen's violation threatened to inflict the exact irreparable harms the injunction was meant to prevent. The court appropriately maintained the status quo set by the injunction by directing Nielsen to make a commercially reasonable offer for standalone Nationwide, which would afford Cumulus the opportunity to avoid those irreparable harms.

**1. The District Court did not abuse its discretion in finding that Nielsen violated the injunction.**

Any purported modification of the injunction was solely to address Nielsen's blatant violation of that injunction. As the District Court explained, Nielsen offered Nationwide at a price that was twenty times what Nielsen charges any other customer and thus "many multiples above the presumptively reasonable safe harbor." SA113. The District Court found that Nielsen's baseless, sky-high offer "*further calls into question Nielsen's good faith*." *Id.* (emphasis added). And Nielsen's proposed [redacted] was predicated on a "disingenuous" reading of the injunction, was concededly "not the industry standard," and was unsupported by any "convincing explanation" for this "deviat[ion] from the typical contract term." SA112. The District Court did not reach these findings on a cold record; it held a hearing with live witness testimony and argument from the parties. *See* Supp. SA1-45. These factual findings are well-supported and are not clearly erroneous. *See Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 108 (2d Cir. 2003) (clear-error standard of review applies "when assessing a district court's factual findings due to that court's 'expertise' as a fact-finder") (citation omitted).

As the District Court recognized, the only justification Nielsen offered for its [redacted] was a single expert report. *See* SA108. Nielsen's expert, however, failed to take the most basic steps to understand the facts of the case. In particular, the expert did not "take into account any illegal behavior by Nielsen

that may have skewed the inputs into [the] model." SA110. Yet "the district court found that Nielsen's Network Policy … constituted an unlawful" tying arrangement. *Cumulus*, 182 F.4th at 125; *see also* SA30. And Nielsen tellingly did "not challenge the district court's conclusion as to the lawfulness of its Network Policy on appeal." *Cumulus*, 182 F.4th at 125.

Nielsen does not even attempt to address the District Court's findings with respect to the serious flaws in its expert's analysis, and has thus waived any challenge to those findings. *See* SA109-111. Nor does Nielsen try to demonstrate clear error with respect to the court's finding of commercial unreasonableness. Nielsen asserts that "nothing in the record proves a violation by any standard," Br. 51, but Nielsen cites nothing to suggest that the District Court clearly erred in holding that Nielsen's [redacted] was commercially unreasonable.

Nielsen tries to avoid the clear-error standard by contending that the District Court improperly shifted the burden to Nielsen. Br. 51. But the court accurately stated the governing standard, recognizing that the "movant" (Cumulus) bears the burden to "establish the non-movant's failure to abide by the injunction." SA107; *see* SA113 (finding that "Cumulus has demonstrated that Nielsen's latest offer is commercially unreasonable").

Nielsen ignores the District Court's accurate description of the burden expressed in its order in favor of out-of-context quotations from a motions conference

that predated the hearing. *See* Br. 51. But there, the court was merely explaining to Nielsen that it had the "burden" to "*rebut*" any evidence offered by Cumulus. SA50 (emphasis added). Indeed, the court told Cumulus's counsel that, if it "were to rule today," it "would deny the motion to enforce because" it has "no record"—making clear that the court knew Cumulus carried the burden. *Id.* That is precisely why the District Court set a hearing to examine the evidence before issuing its decision. The court's rejection of Nielsen's self-serving explanation for its proposed [redacted] is not burden-shifting. *Contra* Br. 51. The District Court found that a [redacted] was commercially unreasonable because "[t]he *record* makes clear that the standard is, and commercially reasonable rates in this industry are, based upon multi-year contracts." SA112-113 (emphasis added).

As the District Court held, Cumulus met its burden of showing that Nielsen's offer was commercially unreasonable. SA113. Nielsen appears to take the position (at 50-51) that there can be no violation because the court rejected both Cumulus's argument that the rate should be within the "safe harbor" and "Nielsen's analysis" supporting its offer. But the court was not limited to those two choices in determining whether Nielsen violated the injunction. With respect to Cumulus's request to enforce the injunction, the relevant question is whether Nielsen's offer was commercially unreasonable—which Cumulus answered by showing that Nielsen's offer was

wildly out of step with what Nielsen charged others, unsupported by any justification, and reflected a sharp break from industry practice. *See supra* pp. 39-40. In fact, Nielsen's violation was so blatant the District Court questioned Nielsen's good faith. *See* SA113.

**2. To the extent the court modified its injunction to address Nielsen's violation, that modification maintained the status quo.**

Nielsen's violation of the injunction upended the status quo by threatening to inflict—and now in fact inflicting—the very irreparable harms the injunction was meant to prevent. When this Court affirmed the preliminary injunction, it recognized that "Cumulus [had] demonstrated that it was likely to suffer irreparable harm in a matter of months." *Cumulus*, 182 F.4th at 138. Those months passed, and by the time the District Court entered its enforcement order, Cumulus was set to lose access to Nationwide the following day. In light of the risk of "unfair prejudice and irreparable harm to Cumulus," the District Court directed Nielsen to affirmatively make a compliant offer. *See* SA113.

To the extent that order is a modification of the injunction, it was not an abuse of discretion because it maintained the status quo created by the injunction. As this Court held, that status quo was one where Nielsen was required to "properly negotiate" to afford Cumulus an opportunity to "obtain" Nationwide at a reasonable price. *See Cumulus*, 182 F.4th at 140. Nielsen failed to do so. And Nielsen made clear

that it would not accept Cumulus's offers or make a new, commercially reasonable offer on its own accord.

This impasse was especially problematic because the window for negotiations had nearly closed with Cumulus about to lose Nationwide, a significant change in circumstances from when the injunction was entered. *See SEC v. Yi Xia*, No. 21-CV-5350 IPKC) (JAM), 2024 WL 3447849, at *10-11 (E.D.N.Y. July 9, 2024) (collecting cases holding that changed circumstances warrant modification). Absent further action from the court, Cumulus would lose access to Nationwide—"thwart[ing] the purpose behind the injunction." *Sierra Club*, 732 F.2d at 257. In these circumstances, an order requiring Nielsen to make a commercially reasonable offer was entirely appropriate.

The stay of the enforcement order has validated the District Court's concerns. By the time of argument before this Court, several of Westwood One's customers, including [redacted], will have stopped purchasing advertising on Westwood One's network because Westwood One lacks access to Nationwide. Supp. SA81-83 ¶¶ 11, 15-17. This will harm Westwood One in the near term because Westwood One will lose vital advertising revenue, and also in the long term because these customers [redacted] Supp. SA82-83 ¶ 14. The loss of this advertising business is immensely significant to the company, not least because it threatens [redacted] Westwood

One. Supp. SA83 ¶ 35. [redacted] Every day Nielsen fails to comply with the injunction, Westwood One is losing good will with its customers, as well as the talent and inventory partners that create high-quality content and ultimately attract advertisers. Supp. SA84-85 ¶ 22. All of this is causing severe reputational damage on an ongoing basis. Supp. SA85 ¶ 23.

**3. The District Court was not required to issue new findings that Cumulus was likely to succeed and suffer irreparable harm absent a modification.**

Nielsen contends that because the new order "commands a positive act," "it could issue only" if Cumulus established the factors necessary to obtain a mandatory injunction: in particular, a substantial likelihood of success and a strong showing of irreparable harm. Br. 32-33.

But Cumulus has *already* demonstrated a strong likelihood of success and a made strong showing of irreparable harm. *See Cumulus*, 182 F.4th at 124-137. Nielsen cites no case requiring *another* showing of strong likelihood of success and irreparable harm for a court to modify the scope of relief necessary to address imminent harms already found irreparable based on claims already found substantially likely to succeed.

Nielsen cites *Sierra Club* and one part of *JLM Couture* (at 33), but neither supports its position. *Sierra Club* articulated the standard governing modifications,

which requires this Court to examine whether the modification effectuates the purpose of the injunction. *See* 732 F.2d at 256. And the part of *JLM Couture* cited by Nielsen (at 33) reviewed a modification order addressing claims the district court had "not previously addressed." *JLM Couture, Inc. v. Gutman*, 616 F. Supp. 3d 359, 375 (S.D.N.Y. 2022). That case has little bearing on the situation here, where the purported modification leaves undisturbed the finding of substantial likelihood of success on the merits and irreparable harm, and (at most) modifies only the specific relief. District courts in this Circuit routinely modify the scope of injunctions without again analyzing the likelihood of success on the merits and irreparable injury. *See, e.g.*, *Yi Xia*, 2024 WL 3447849, at *12; *Marsh USA LLC v. Parrish*, No. 25-cv-6208 (GBD), 2026 WL 2767113, at *1 (S.D.N.Y. Sept. 17, 2026).

Nielsen complains that the District Court never "analyzed whether Cumulus was clearly likely to succeed on a claim entitling it to an offer at a court-approved price." Br. 34-35. But there is no "court-approved price" here. And it is both circuit precedent and the law of this case that Cumulus is substantially likely to succeed on the merits of its tying claim, that Nielsen effectuated this tie through commercially unreasonable pricing, and that the injunction is an appropriate way to remedy Cumulus's harms. *See Cumulus*, 182 F.4th at 135-137; *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009); *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996). Whether those holdings permit the court to direct Nielsen to make an offer concerns

how the court *enforces* that injunction—not a new merits question. To the extent the District Court modified the injunction, the relevant standard is whether the modification effectuates the purposes of the injunction—a standard that is plainly met. *See supra* pp. 38-44.

### B. The Enforcement Order Does Not Violate Antitrust Law.

Nielsen next argues that the enforcement order violates antitrust law by compelling the parties to deal and making the District Court "a rate-setting regulator." Opening Br. 35-45. These contentions—which this Court has already rejected—fail.

At the outset, Nielsen's arguments further demonstrate that this Court lacks jurisdiction. Nielsen's assertions about how the enforcement order violates antitrust law are nearly identical to Nielsen's arguments about how the injunction violated antitrust law. Then, as now, Nielsen staunchly defended its right to charge monopoly prices. *Compare* Br. 41 (citing *Trinko*), *with* No. 26-88 Opening Br. 21-22 (citing same). Then, as now, Nielsen railed that the District Court had impermissibly acted as a central price planner. *Compare* Br. 40-45, *with* No. 26-88 Opening Br. 24-25. Then, as now, Nielsen complained that regulating the price for Nationwide infringed its ability to recover its costs. *Compare* Br. 37, *with* No. 26-88 Opening Br. 36. And then, as now, Nielsen faulted the District Court for making Nielsen "guess[]" at a

commercially reasonable rate. *Compare* Br. 43-45, *with* No. 26-88 Opening Br. 40-41.

This Court rejected each of those arguments only a few months ago. This Court recognized that "'antitrust law does not prohibit lawfully obtained monopolies from charging monopoly prices,' …. [b]ut the difference here is that" Nielsen's conduct is likely anticompetitive. *Cumulus*, 182 F.4th at 130 (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 454 (2009)). This Court was "not persuaded by Nielsen's argument that relief in this context cannot regulate a product's price, since '[t]o ensure ... that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined.'" *Id.* at 139 (quoting *Loew's*, 371 U.S. at 53). This Court held that Nielsen's cost-recovery concerns were unsupported by the record. *Id.* at 134. And this Court held that the injunction did not impermissibly make Nielsen guess at a rate, particularly in light of Nielsen's "inability to articulate a more precise injunction." *Id.* at 139.

Nielsen's recycling of these arguments demonstrates that this appeal is nothing more than a collateral attack on the injunction. But this Court's affirmance of that injunction is now both circuit precedent and the law of the case. Unless the Supreme Court holds differently, Nielsen is not entitled to relitigate the merits of the injunction.

In any event, Nielsen's arguments fail. Nielsen argues that the enforcement order impermissibly "compel[s] Nielsen to deal with Cumulus." Opening Br. 36. That is wrong on both the facts and the law. The Court's enforcement order does not compel a new sale. Nielsen has already offered its product to Cumulus—multiple times, most recently on September 11. Supp. SA53-54. The enforcement order instead requires Nielsen to make an offer at a commercially reasonable rate.

As to the law, the refusal-to-deal doctrine emerged to prevent market participants from being forced to deal with their "rivals." *See Trinko*, 540 U.S. at 410; *linkLine*, 555 U.S. at 449-450 (characterizing *Trinko* as recognizing that the defendant "had no antitrust duty to deal with its rivals"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam) (applying duty-to-deal doctrine in case where defendant refused to deal with "competitors"); *Twin Lab'ys, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990) (discussing "the policy behind prohibiting denial of an essential facility to a competitor"). But Cumulus is not a competitor; it is a customer with whom Nielsen wants to do business. Nielsen's repeated citations to cases like *Trinko* and reference to the "essential facilities" doctrine make no sense in this context. *See United States v. Google LLC*, 778 F. Supp. 3d 797, 866 (E.D. Va. 2025) ("Courts have declined to 'extend[ ] a refusal-to-deal-with-rivals analysis' to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors." (citation omitted)).

Regardless, *Trinko* and the like did not address "the legality of compelling a defendant already found liable under" the Sherman Act "to deal" with others. *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 948 (9th Cir. 2025). Nielsen is not a monopolist refusing to sell to a competitor in the ordinary course of business or even a seller that sets its price according to the market. *Contra* Br. 39. Nielsen is a monopolist found likely to be violating antitrust law, and it is subject to a remedial order. And it is "well established that antitrust remedies can and often must proscribe otherwise lawful conduct to unwind and further prevent violators' anticompetitive activity." *Google Play*, 147 F.4th at 948 (affirming injunction requiring defendant to deal with its competitors); *see also Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 697-698 (1978).

This remedial authority extends to requiring an antitrust defendant to deal with its customers in a particular way.[6] In *Loew's*, for example, the Supreme Court modified an anti-tying injunction to also prohibit "temporary refusals to deal" between the defendant and its customers. *See* 371 U.S. at 55. This prohibition, the Court explained, was "designed to prevent [the defendants] from subjecting prospective

[6] More broadly, as one of Nielsen's own cases explained, a monopolist has a "right" to refuse to deal "as long as he has no purpose to restrain competition or to enhance or expand his monopoly, *and does not act coercively*." *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 928 (2d Cir. 1980) (emphasis added). Here, this Court has held that Nielsen is substantially likely to have acted coercively. *See Cumulus*, 182 F.4th at 126.

purchasers to a 'run-around' on the purchase of individual" (non-tied) products, which "may tend to force some [purchasers] into buying pre-set packages." *Id.* The order here likewise aims to prevent the same harms caused by Nielsen's original anticompetitive conduct—Cumulus's inability "to properly negotiate and thereby obtain" Nationwide, 182 F.4th at 140—and is thus consistent with antitrust law.

Nielsen responds that "curing th[e] tie does not require compelled dealing" and that "[t]he command to deal … reaches well beyond the tie" because "the Injunction *already* bars" Nielsen's anticompetitive conduct. Br. 38. *But Nielsen violated that injunction*—and remains in violation of the injunction, which has not been stayed. In light of Cumulus's imminent loss of Nationwide, merely ordering "Nielsen to withdraw its offer," Br. 38, would "not assuage the serious risk of Cumulus's harm coming to pass," *Cumulus*, 182 F.4th at 140. Instead, it would permit Nielsen to thwart the injunction. Nielsen faults the District Court for considering this "loss of access," Br. 39, but the purpose of the injunction is to remedy Cumulus's irreparable harm, which is caused by loss of access to Nationwide, *see Cumulus*, 182 F.4th at 140.

Nielsen's rate-setting arguments, *see* Br. 40-45, fare no better. Nielsen's generic quotations about price-setting cannot change the fact that the order does not set a rate or require Nielsen to submit its rate to the court for approval. Indeed, one of Nielsen's complaints with the order is that it does *not* set a rate. Br. 43-45. Nielsen's

contention that this silence means the court "has set the price" but just has not told everyone, *id.* at 45, is contrary to the Court's order.

Nielsen concedes that the injunction's "rate prohibition regulates price." Br. 41; *see Cumulus*, 182 F.4th at 139 (rejecting "Nielsen's argument that relief in this context cannot regulate a product's price, since '[t]o ensure … that relief is effectual, otherwise permissible practices connected with the facts found to be illegal must sometimes be enjoined'" (citation omitted)). That is fatal: If the injunction appropriately regulates price by barring Nielsen from charging commercially unreasonable rates, then so does the enforcement order's direction to charge a commercially reasonable rate.

Nielsen disparages the District Court's method of analyzing Nielsen's post-injunction offer—by probing the prices, costs, and assumptions that went into Nielsen's expert's model and by considering industry-standard contract terms, *see* SA109-113—as asking "questions a utility commission asks." Br. 42-43. But Nielsen offers no explanation for how else a court is supposed to determine whether a proposed offer is commercially reasonable than by considering such factors. Indeed, Nielsen's core complaint appears to be that the District Court's assessment was too thorough. Nielsen also says (at 42) that the District Court's methodology "disqualifies every price Nielsen charges as a reference point." But the injunction expressly states that a presumptively reasonable rate is one that is no higher than the highest

rate Nielsen charges other customers, *see* SA47—a rate Cumulus would be happy to pay.

Finally, this Court should disregard Nielsen's handwringing about the long-term consequences of the order. *See* Br. 43-44. The order commands Nielsen to take one discrete action: make an offer for a commercially reasonable rate. If Cumulus accepts the offer, the parties can enter into a contract. Nielsen's concern that a price may become unreasonable over the course of a "multiyear" contract, *see* Br. 44, has nothing to do with the order's command to make a commercially reasonable offer *today*. Nielsen's position is unsupported by its sole cited case—which concerns unlawful price-fixing by the parties, not a remedial order regulating prices. *See United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927). Nielsen is free, moreover, to go back to the District Court for further guidance or to seek to modify the injunction.

Nielsen's argument that the order portends "depositions, declarations, and a live evidentiary hearing on price, term, and the analysis behind" every subsequent offer, Br. 44, is nearly identical to what Nielsen is currently telling the Supreme Court the *injunction* requires: seriatim "evidentiary hearing[s] on the price, term, and methodology of Nielsen's new offers," Pet. 25. According to Nielsen itself, then, the enforcement order does not accomplish anything the injunction this Court affirmed does not already contemplate. Nielsen ignores, moreover, that it may readily

comply with the injunction by offering Nationwide at a rate within the District Court's safe harbor.

### C. The District Court Did Not Abuse Its Discretion In Stating That It Would Charge Nielsen A Daily Fine For Noncompliance.

Nielsen's final argument is that the District Court erred in imposing a conditional fine for every day Nielsen fails to abide by the order. *See* Br. 45-53. This Court should reject that argument.

"A court can take 'any reasonable action ... to secure compliance'" with an order, "and the 'scope of a district court's equitable powers to remedy past wrongs is broad.'" *Tronox*, 588 F.3d at 112 (quoting *Berger*, 771 F.2d at 1568). One such reasonable action is ordering "[m]oney payments contingent on non-compliance," which is "a traditional means of enforcing injunctions." *Rodriguez v. Swank*, 496 F.2d 1110, 1113 (7th Cir. 1974); *see e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) (identifying a "per diem fine" as a means of "coerc[ing] the defendant into compliance with the court's order" (citation omitted)); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 55, 57 (2d Cir. 1982) (affirming "contingent fine of $5000 for each day … that [the defendant] continued its noncompliance with the court's injunctive orders").

The District Court did not abuse its discretion in reaching for this traditional enforcement tool. *See Tronox*, 588 F.3d at 112 (the "choice of how to enforce [its] order is reviewed for abuse of discretion"). At the time the District Court entered its

order, Cumulus was hours away from suffering the irreparable harm the injunction was meant to forestall, and Nielsen had thus far only made offers that caused the court to question its "good faith." SA113. In these circumstances, it was eminently reasonable for the court to coerce Nielsen's compliance through monetary fines.

Nielsen does not directly challenge the threatened fines as an abuse of discretion. Nielsen instead argues that the District Court lacked authority to impose this traditional enforcement remedy because the court did not apply the standard governing civil contempt sanctions. *See* Br. 45-53.

That argument fails. "Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt." *Berger*, 771 F.2d at 1569 (citing *Alexander v. Hill*, 707 F.2d 780, 783 (4th Cir. 1983)). In *Rodriguez*, for example, the Seventh Circuit affirmed an enforcement order that threatened monetary sanctions for noncompliance as "well within the district court's discretion"—without any discussion of whether the sanctions satisfied the contempt framework. *See* 496 F.2d at 1112-13. *Alexander* is even clearer. The district court entered an order to ensure "future compliance" with its previous orders through weekly "remedial fine[s]." 707 F.2d at 782-783. "On appeal," the defendant argued that "the district court lacked authority to impose remedial fines or penalties absent a finding of contempt or bad faith." *Id.* at 783. The Fourth Circuit rejected that argument. As the court explained, "incantations should not decide cases, and the

lack of a finding of contempt or of bad faith should not preclude exercise of inherent equitable powers to achieve fair remedial results." *Id.* As these cases demonstrate, the District Court was not required to first find Nielsen in contempt before it sought to enforce the injunction through coercive monetary fines.

Nielsen overreads *EEOC v. New York Times Co.* when it argues that "*any* 'supplementary remedy to compel compliance' is reviewed 'in the same manner as if the court had held [the defendant] in contempt.'" Br. 46 (quoting 196 F.3d 72, 80 (2d Cir. 1999)). *New York Times* concerned three orders: a consent decree, an initial enforcement order entered in response to conduct that violated the consent decree, and a second enforcement order entered in response to conduct that violated the decree and the first enforcement order. *See* 196 F.3d at 75. This Court applied the contempt framework only to the part of the second enforcement order finding that the defendant violated the first enforcement order. *See id.* at 80-81. As the only court to grapple with this aspect of *New York Times* to Cumulus's knowledge has explained, that case's "bifurcat[ion of] the contempt analysis … highlights that while contempt standards are appropriate in some cases—such as where a party violates a subsequent enforcement order—contempt standards are not necessarily applicable where, as here, conduct violates an underlying prior order." *United States v. Visa U.S.A., Inc.*, No. 98 CIV. 7076 (BSJ), 2007 WL 1741885, at *4 (S.D.N.Y. June 15, 2007).

If anything, *New York Times* underscores that enforcement orders containing coercive sanctions need *not* be reviewed under the contempt framework. This Court simply stated that it would "review" the second enforcement order "as if the court had held appellants in contempt," 196 F.3d at 80—not that this review is necessary in every case where an enforcement order contains a coercive sanction. That is confirmed by this Court's citation to *Berger*, *see id.*, in which this Court explained that "a reviewing court *may* treat" a "remedy to compel compliance" entered without "a finding of contempt" "as if it were a sanction imposed on an order of contempt," 771 F.2d at 1569 n.19 (emphasis added). But even as *Berger* articulated that option, it declined to take it: This Court expressly rejected reviewing an enforcement order "as an exercise of the court's power to hold a party in contempt" and instead "rest[ed]" its "analysis … on the district court's even more basic authority to compel compliance with its orders." *Id.* This Court should do the same.

If this Court agrees with Nielsen that the District Court was required to apply the contempt standard "whether or not the district court expressly holds a party in contempt," Br. 46, Cumulus agrees with Nielsen that the proper remedy is to vacate only the threatened fine, *see id.* at 45, 53, while leaving in place the order requiring compliance.

This sanctions issue, in any case, is all but moot. "In the context of purely coercive civil contempt, a contemnor's compliance with the district court's underlying order moots the contemnor's ability to challenge his contempt adjudication." *RES-GA Cobblestone, LLC v. Blake Constr. & Dev., LLC*, 718 F.3d 1308, 1314 (11th Cir. 2013) (citation omitted); *see also, e.g., United States v. Paccione*, 964 F.2d 1269, 1274 (2d Cir. 1992) (concluding that "appeal from the order finding him in civil contempt is moot" after the defendant, [w]ithin the designated time period, … complied and apparently purged himself); *United States v. Zakharia*, 418 F. App'x 414, 425-426 (6th Cir. 2011) (collecting cases); *United States v. Chai*, 3 F. App'x 941, 944 (10th Cir. 2001) (same).

Nielsen has made clear that it intends to avoid monetary sanctions by complying with the enforcement order. At the moment Nielsen became subject to daily fines, it complied with the enforcement order by making a commercially reasonable offer for standalone Nationwide. *See* Supp. SA46-47. In a typical case, that compliance would have rendered "the issue of the propriety of the contempt judgment … moot." *In re Hunt*, 754 F.2d 1290, 1293 (5th Cir. 1985). To be sure, Nielsen promptly retracted its offer after this Court administratively stayed the order. Supp. SA46. But Nielsen cannot un-ring the bell: In the absence of a stay from this Court, Nielsen would have complied with the enforcement order and thus mooted its appeal.

Finally, Nielsen's attempt to reframe the enforcement order as an order holding it in contempt underscores that this Court lacks jurisdiction over this appeal. It is blackletter law that "[a]n order for civil contempt may ordinarily be challenged on appeal *only after entry of final judgment*." *JLM Couture*, 91 F.4th at 100 (citation omitted) (emphasis added). And although a civil contempt order may be immediately appealable under 28 U.S.C. § 1292(a)(1) when it modifies an injunction, this Court has recognized that threatening a "monetary fine for each day [the defendant] remains noncompliant" does not meet that standard. *See JLM Couture*, 91 F.4th at 100-101; *see also, e.g.*, *FTC v. Zurixx*, 26 F.4th 1172, 1175-76 (10th Cir. 2022) (holding that contempt order requiring defendant "to pay the Receiver's legal fees" if the defendant did not comply within 30 days was not immediately appealable because it "merely enforced a previously granted preliminary injunction"); *Weston Cap. Advisors, Inc. v. PT Bank Mutiara*, 667 F. App'x 15, 16-17 (2d Cir. 2016) (summary order) (dismissing interlocutory appeal of civil contempt order imposing escalating per diem fines for non-compliance).

Nielsen's attempt to fit this case into the civil-contempt framework only confirms that this case is not properly before the Court.

## III. IF THIS COURT AGREES WITH NIELSEN ON ANY GROUND, IT SHOULD EITHER MODIFY THE ORDER OR REMAND WITH CLEAR GUIDANCE.

The District Court's enforcement order is an appropriate and reasonable way to secure Nielsen's compliance with the injunction. Indeed, Nielsen has already demonstrated that it will comply with the injunction if the Court lifts the stay of the District Court's enforcement order.

If the Court concludes that any portion of the enforcement order is overbroad, however, it should modify that portion as warranted or, at the least, offer the District Court clear guidance on how to enforce its injunction to short-circuit any further appeals with respect to this issue. *See* 28 U.S.C. § 2106; *Smith v. Woosley*, 399 F.3d 428, 436 (2d Cir. 2005) (modifying an injunction so that it did not "inadvertently sweep too broadly"); *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1183-84, 1187 (9th Cir. 2025) (affirming an enforcement order insofar as it restated the injunction while modifying provisions that were "overbroad").

The injunction is currently in effect, and Nielsen continues to refuse to comply with it. Cumulus is suffering the precise irreparable harms that the injunction was meant to prevent. Nielsen has repeatedly demonstrated that it will do everything possible to avoid compliance with the injunction and inflict further harm on Cumulus, the only audio media company that has sued Nielsen over its tying policy. Indeed, as far as Cumulus is aware, Nielsen *continues to enforce its tying policy* as to

every other large audio media company, while demonstrating the penalties for anyone who seeks to enforce the antitrust laws against it: An endless cycle of litigation for a company that, as of the time of argument, will have [redacted] due to Nielsen's anticompetitive conduct. All Cumulus seeks is the relief to which it is entitled under law.

## CONCLUSION

This Court should dismiss for lack of jurisdiction. If this Court concludes that it has jurisdiction, it should affirm.

Respectfully submitted,

/s/ Katherine B. Wellington

KATHERINE B. WELLINGTON
*Counsel of Record*
HOGAN LOVELLS
CADWALADER US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1037
katherine.wellington@hlc.com

CHARLES LOUGHLIN
JENNIFER FLEURY
MICHAEL J. WEST
HOGAN LOVELLS
CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*Counsel for Plaintiff-Appellee Cumulus Media New Holdings Inc.*

October 14, 2026

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(5), as modified by Local Rule 32.1(a)(4)(A), because it contains 13,811 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

*/s/ Katherine B. Wellington*
Katherine B. Wellington

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed with the Clerk using the Appellate Case Management System ("ACMS") on October 14, 2026. All counsel of record are registered ACMS users, and service will be accomplished by the ACMS system.

*/s/ Katherine B. Wellington*
Katherine B. Wellington